NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DAVID BREECE,                       :
                                    :   Civil Action No. 02-5547 (GEB)
            Petitioner,             :
                                    :
        v.                          :   OPINION   RECEIVED
                                    :
ROY L. HENDRICKS, et al.,           :   OCT 2 8 2005
                                    :
            Respondents.            :   AT 8:30 _____ [.]
                                        WILLIAM T. WALSH
                                             CLERK

**APPEARANCES:**

Petitioner pro se
David Breece
#280793/SBI 135545B
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

Counsel for Respondents
Linda K. Danielson
Deputy Attorney General
Division of Criminal Justice
Appellate Bureau
P.O. Box 086
Trenton, NJ 08625

**BROWN, JR.,** Chief Judge

Petitioner David Breece, a prisoner currently confined at
New Jersey State Prison, has submitted a petition for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are
Superintendent Roy Hendricks and the Attorney General of the
State of New Jersey.

For the reasons stated herein, the Petition must be denied.

## I.  BACKGROUND

### A.  Factual Background

The relevant facts are set forth in the opinion of the
Superior Court of New Jersey, Appellate Division.[1]

> On May 14, 1994, at approximately 8:50 p.m.,
> Stanley Piontek arrived at Obsessions, a bar in
> Trenton.  Sometime before 9:30 p.m., the bartender
> refused to serve Piontek any further alcoholic
> beverages because he believed that Piontek was
> intoxicated.  Defendant and Kurt Gafgen arrived at
> Obsessions between 9 and 10 that evening.  They
> proceeded to the back room to play pool.  An hour
> later, defendant left the pool room and took a seat at
> the bar next to Piontek.
>
> Piontek was a forty-nine year old, unmarried man
> who lived with his parents in nearby Hamilton.  He did
> odd jobs for family, neighbors and friends.  At the
> time, he was installing aluminum siding on his
> brother's house and was carrying several hundred
> dollars.  One of the go-go dancers at Obsessions knew
> that Piontek had "lots of money" because "it kept
> falling all over the place, and he kept bending down to
> pick it up."  Another go-go dancer testified that she
> saw Piontek clutching many bills including at least two
> twenties.  He gave her tips throughout the evening,
> including a five or ten dollar bill and singles.
> Robert Muscatell, a patron, testified that Piontek had
> a "pretty big wad" including fifty and twenty dollar
> bills.  He estimated that Piontek had several hundred
> dollars in his possession.
>
> Muscatell testified that Piontek sat between him
> and defendant at the bar.  He described Piontek as
> "staggering bounding back and forth."  However, he

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding
instituted by an application for a writ of habeas corpus by a
person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be
presumed to be correct.  The applicant shall have the burden of
rebutting the presumption of correctness by clear and convincing
evidence."

stated that Piontek was not trying to cause anyone any trouble. The go-go dancers confirmed that Piontek was bumping into people but he did not seem to be trying to cause trouble.

Unfortunately, defendant took offense at Piontek's inability to sit still. Defendant asked Muscatell if he was bothered by Piontek's constantly bumping into him, and Muscatell said he was not. Muscatell recalled that defendant said Piontek had been "bumping into me all night, if he keeps bumping into me, I'm going out and beat his ass." Muscatell responded that the guy was drunk and harmless, and the bartender told defendant, "don't start no trouble in here. If you got trouble, take it outside." In his statement to the police, Muscatell related that defendant said he "was going to kick his ass out in the parking lot." Another patron recalled defendant say something like "somebody ought to, you know, beat his ass."

Defendant had been at the bar for half an hour when Gafgen joined him. Defendant told him Piontek was "being a jerk." At some point defendant complained to the bartender, who said he would take care of it but apparently did nothing, because Piontek did not cease the behavior which disturbed defendant. The bartender confirmed the complaint but said he told defendant to ignore Piontek because he was drunk.

Between 10 and 10:30 p.m., while one of the go-go dancers was on stage, Piontek tried to touch her breast and the bartender stopped him, not an unusual event. The dancer heard sounds of disapproval from the other customers but not threatening remarks directed at Piontek. Defendant later told police that he saw Piontek grab the dancer and told him to stop. Defendant thought Piontek was intentionally trying to be obnoxious.

Defendant testified that some time later he told Gafgen "I ought to punch the guy in the mouth because he kept 'starting'." Later still, defendant told Gafgen that Piontek was "being a jerk and if he keeps it up, I'm going to go outside with him." Defendant assumed Gafgen would follow him outside, but he did not want or request Gafgen's help. When asked, "[a]t any time that night did you decide to pick a fight with

3

this man?" defendant responded, "[o]nly because he kept bumping into me."

Gafgen testified that defendant's first comment was, "this guy is being a real asshole," and that defendant intended "to see what the guy's problem is." Defendant then pointed to Piontek, whom Gafgen had not even noticed and whose behavior he could not recall. Twenty minutes later, defendant told Gafgen that Piontek was carrying a lot of money and that he was "going to go out there and roll him," meaning rob him. Gafgen testified that he did not take defendant seriously, and responded only with a dismissive comment.

Eventually, Piontek left the bar. A patron saw defendant and Gafgen leave the bar a minute or two later. According to defendant, he caught up with Piontek on the other side of the street, asked him "why he was being a jerk," and Piontek spit on him. Piontek did not apologize for any of his conduct, so defendant punched him in the face, making him fall to the ground.

Gafgen provided a different account of their encounter. He testified that as he left the bar, he saw defendant across the street and heard defendant call out, "yo". Piontek turned and defendant punched him. Gafgen also heard a loud noise and presumed it was Piontek falling.

Defendant said that after Piontek fell, he first noticed Gafgen standing behind him. Gafgen's version was that he crossed the street after Piontek fell, but watched from a distance as he saw defendant squat down over Piontek. Gafgen said he was unable to see defendant's hands or what defendant might have been doing. Gafgen and defendant then walked away from the scene. Within a few minutes defendant asked Gafgen not to say anything about the incident, and gave Gafgen six dollars. Defendant said he gave Gafgen the money "[b]ecause he was broke" and had needed defendant to buy two drinks for him at Obsessions. According to Gafgen defendant said he found twelve dollars on Piontek, then gave him half for no apparent reason.

After several minutes, Gafgen and defendant returned to the scene. Gafgen asserted that he walked back alone to see if Piontek was all right. Piontek

4

was in the same position, on the ground with his knee
in the air, and Gafgen shook it as defendant looked on
from ten feet away.  There was no response, so Gafgen
told defendant they had to call 911, which they did
from the phone booth on the opposite street corner.
Defendant asked Gafgen not to tell the police that he
had hit Piontek, but instead to say that they came out
of Obsessions and "found him like that."  Gafgen was
"really scared" and agreed to respond as requested but
advised defendant that he did not know how long he
could maintain that story.  Later, defendant insisted
that he and Gafgen went together to check on Piontek,
and that calling the police and an ambulance was his
idea rather than Gafgen's.  The police arrived in ten
minutes, and Gafgen and defendant both told them they
had found Piontek lying on his back with one knee
flexed.

An autopsy revealed a two centimeter laceration
and some bleeding on the upper left side of the head.
There was also a small cut and a small bruise at the
upper right corner of the mouth.  An X-ray of the skull
revealed a two centimeter bone fracture on the left
side of the head which corresponded to the laceration.
The fracture caused massive hematomas and hemorrhages.
The pathologist opined that Piontek died from massive
head injuries due to a fall and that death occurred
within two minutes of the fall.

Two or three days after Piontek's death, Gafgen
told his brother about the events of May 14.  Five days
later, he told a co-worker over a drink at Obsessions,
the bar in which he and defendant had encountered
Piontek.  After leaving Gafgen, the co-worker called
the police.  The following day, Gafgen gave a statement
to the police.  As a result of this statement,
defendant was questioned and later defendant and Gafgen
were charged with felony murder and robbery.

(Answer, Ex. R4.)

B.   Procedural History

Petitioner was tried to a jury and convicted, in the

Superior Court of New Jersey, Law Division, Mercer County, of

felony murder in violation of N.J.S.A. 2C:11-3a(3) and second

5

degree robbery in violation of N.J.S.A. 2C:15-1 and 2C:2-6.
Following merger of the robbery conviction with the felony murder
conviction, on April 16, 1996, Judge Rosemarie Williams sentenced
Petitioner to a term of life in prison with a 30-year parole
disqualifier.  By Opinion filed May 7, 1998, the Appellate
Division affirmed.  (Answer, Ex. R4.)  The Supreme Court of New
Jersey denied certification on September 11, 1998.  (Answer, Ex.
R7.)

Petitioner filed a timely motion for post-conviction relief
which was denied by the trial court, without an evidentiary
hearing, on June 19, 2000.  (Answer, Ex. R8 at Da38-48.)  On
February 22, 2002, the Appellate Division affirmed the denial of
relief substantially for the reasons stated by the trial court.
(Answer, Ex. R10.)  On June 19, 2002, the Supreme Court of New
Jersey denied certification.  (Answer, Ex. R13.)

Petitioner timely filed this Petition for writ of habeas
corpus pursuant to 28 U.S. § 2254.  Respondents have answered,
and Petitioner has filed a traverse in support of the Petition.
This matter is now ripe for determination.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty
Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent
part:

> (a) The Supreme Court, a Justice thereof, a circuit
> judge, or a district court shall entertain an

6

application for a writ of habeas corpus in behalf of a
person in custody pursuant to the judgment of a State
court only on the ground that he is in custody in
violation of the Constitution or laws or treaties of
the United States.

With respect to any claim adjudicated on the merits in state

court proceedings, the writ shall not issue unless the

adjudication of the claim

(1) resulted in a decision that was contrary to,
or involved an unreasonable application of, clearly
established Federal law, as determined by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court

precedent "if the state court applies a rule that contradicts the

governing law set forth in [Supreme Court] cases," or "if the

state court confronts a set of facts that are materially

indistinguishable from a decision of th[e] Court and nevertheless

arrives at a result different from [the Court's] precedent."

Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J.,

for the Court, Part II).  A state court decision "involve[s] an

unreasonable application" of federal law "if the state court

identifies the correct governing legal rule from [the Supreme]

Court's cases but unreasonably applies it to the facts of the

particular state prisoner's case," and may involve an

"unreasonable application" of federal law "if the state court

7

either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other

federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).[2]

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989);

---

[2] Respondents contend that Petitioner raised certain claims in state court only as a state law claims, and not as federal constitutional claims. Thus, they contend that these claims are not exhausted. Nevertheless, they proceed to address the claims on the merits. As all claims are meritless, this Court will exercise its discretion to deny the claims pursuant to § 2254(b)(2), without regard to whether they were properly exhausted in state court.

United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969),
cert. denied, 399 U.S. 912 (1970).

### III.   ANALYSIS

#### A.   Evidentiary Rulings

It is well-established that the violation of a right created
by state law is not cognizable as a basis for federal habeas
relief.   Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have
stated many times that 'federal habeas corpus relief does not lie
for errors of state law.'" (quoting Lewis v. Jeffers, 497 U.S.
764, 680 (1990))).   Accordingly, Petitioner cannot obtain relief
for any errors in state law evidentiary rulings, unless they rise
to the level of a deprivation of due process.

For a habeas petitioner to prevail on a claim that an
evidentiary error amounted to a deprivation of due process, he
must show that the error was so pervasive as to have denied him a
fundamentally fair trial.   United States v. Agurs, 427 U.S. 97,
108 (1976).

#### 1.   Cross-examinations about Petitioner's finances

At trial, Officer Rios testified that Petitioner had told
him that he took $12.00 from Piontek.   On direct examination,
Petitioner testified that he made no such statement to Officer
Rios, and testified further that he had $30.00 with him on the
date of the offense and that he was collecting between $200 and
$300 in unemployment compensation every two weeks.   On cross-

examination, the prosecutor asked Petitioner about his living arrangements at the time of the offense.  Defendant answered that he, his fiancee, and children had been forced to leave the apartment in which they were living because the people with whom they were living had been evicted.  The prosecutor questioned Petitioner further about his financial status, his means of support of his family, and his need on the date of the offense for $1,400 toward a deposit and first month's rent for an apartment.

Petitioner contends that he testified about his finances only in response to the detective's testimony that he had confessed to robbing the victim.  He argues that the state should not have been permitted to introduce evidence of his impecuniosity as a motive for committing the crimes.  Petitioner contends that the prosecutor's questioning of Petitioner and his fiancee on this subject went beyond the scope of direct examination.

The Appellate Division found that because Petitioner introduced evidence that he had no financial motive to rob Piontek the prosecutor could challenge those assertions on cross-examination.

The determination of the Appellate Division was not contrary to or an unreasonable application of clearly established federal law.  Whatever Petitioner's motivation for testifying that he had

11

no financial motive to commit a robbery, introduction of evidence to rebut that testimony did not deprive Petitioner of a fundamentally fair trial. Petitioner is not entitled to relief on this claim.

2. Testimony of Medical Examiner

On May 16, 1994, the medical examiner recorded the cause of death as "massive head injuries due to a fall." One week later, on May 23, 1994, she revised the cause of death on the autopsy report to "massive head injuries due to fall due to punch on the face during robbery."

Petitioner contends that the medical examiner made this change based upon information received from the Trenton Police Department and that she should not have been permitted to opine that the cause of death was due to a punch in the face during a robbery. Petitioner contends that this conclusion expressed an opinion about his criminal guilt, a determination exclusively within the jury's domain, and went beyond the area of the medical examiner's expertise.

The Appellate Division agreed that the medical examiner should not have testified that the activities leading up to Piontek's death constituted a robbery. "However, this testimony could not have prejudiced defendant. The medical examiner testified that she derived her information from police reports and the jury was properly instructed regarding the manner in

12

which it must evaluate expert testimony.   Furthermore, defendant never contested that the punch he delivered caused the fall."  (Answer, Ex. R4.)

The decision of the Appellate Division was not contrary to or an unreasonable application of clearly established federal law.   In view of all of the other evidence regarding the circumstances surrounding Piontek's death, it cannot be said that this comment by the medical examiner deprived Petitioner of a fundamentally fair trial.   Petitioner is not entitled to relief on this claim.

### 3.   Autopsy Photos

Two autopsy photos depicting the head of the victim were admitted in evidence during the direct testimony of the medical examiner and were considered by the jury during their deliberations.

Petitioner contends that the photos should have been excluded because they were cumulative and unduly prejudicial.

The Appellate Division concluded that the photographs were not "unduly gruesome or inflammatory."   (Answer, Ex. R4.)

The conclusion of the Appellate Division is not contrary to or an unreasonable application of clearly established federal law.   Copies of the photographs were not provided to this Court, but the medical examiner's explanation of the photographs is that one photograph depicted a laceration of less than one inch in

13

length and blood from that laceration, and the other depicted a very small bruise and cut in the area of the mouth.  (Answer, Ex. R17 at 94-99.)  Petitioner does not dispute the description of the photographs.  Admission of such photographs did not deprive Petitioner of a fundamentally fair trial.  See, e.g., Lesko v. Owens, 881 F.2d 44, 51-52 (3d Cir. 1989) (where probative value of evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence may violate fundamental fairness and due process).  Petitioner is not entitled to relief on this claim.

B.   Right of Confrontation

During the direct examination of Gafgen, the jury learned that he had been charged with felony murder and, in exchange for testifying against defendant, he was allowed to enter a guilty plea to hindering apprehension and to receiving stolen property.  It also learned that Gafgen's sentencing exposure was five years in prison for hindering apprehension, and six months in prison for receiving stolen property.  During Gafgen's cross-examination, defense counsel characterized the exposure Gafgen avoided as "the thirty-year hard time you would face for felony murder," and Gafgen agreed.  Defense counsel repeated that characterization in his summation.

(Answer, Ex. R4.)  Defense counsel was not permitted, however, to bring out specifically the fact that the thirty-year term was parole ineligible.

Petitioner contends that he was deprived of his Sixth Amendment right of confrontation when the trial court permitted defense counsel to inquire into the parameters of Gafgen's deal

14

with the state and the length of sentence Gafgen could have received if convicted, but denied defense counsel's request to state specifically that the 30-year term was mandatory.

The Appellate Division agreed that Petitioner should have been allowed to bring out the period of parole ineligibility Gafgen originally faced, but held that on this record, where the jury had been informed as to the difference in sentencing exposure Gafgen faced and had heard that Gafgen originally faced "thirty years hard time," the error was harmless.

> The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, "means more than being allowed to confront the witness physically." Indeed, "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" Of particular relevance here, "[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

> ...   [T]he focus of the prejudice inquiry in
> determining whether the confrontation right has been
> violated must be on the particular witness, not on the
> outcome of the entire trial.   ...   We think that a
> criminal defendant states a violation of the
> Confrontation Clause by showing that he was prohibited
> from engaging in otherwise appropriate cross-
> examination designed to show a prototypical form of
> bias on the part of the witness, and thereby "to expose
> to the jury the facts from which jurors ... could
> appropriately draw inferences relating to the
> reliability of the witness."   ...
>
>    ...   [W]e hold that the constitutionally improper
> denial of a defendant's opportunity to impeach a
> witness for bias, like other Confrontation Clause
> errors, is subject to Chapman[ v. California, 386 U.S.
> 18 (1967)] harmless-error analysis.  The correct
> inquiry is whether, assuming that the damaging
> potential of the cross-examination were fully realized,
> a reviewing court might nonetheless say that the error
> was harmless beyond a reasonable doubt.  Whether such
> an error is harmless in a particular case depends upon
> a host of factors, all readily accessible to reviewing
> courts.  These factors include the importance of the
> witness' testimony in the prosecution's case, whether
> the testimony was cumulative, the presence or absence
> of evidence corroborating or contradicting the
> testimony of the witness on material points, the extent
> of cross-examination otherwise permitted, and, of
> course, the overall strength of the prosecution's case.

Delaware v. Van Arsdall, 475 U.S. 673, 678-84 (1986) (citations

and footnotes omitted).

Here, there was substantial evidence corroborating Gafgen's

testimony, including the facts that the victim's pocket was

turned out when police arrived and that Petitioner never denied

punching the victim.  In addition, defense counsel was permitted

to elicit that Gafgen had originally faced the same charges as

Petitioner and that his exposure to incarceration was reduced

16

from 30 years "hard time" to five and one-half years pursuant to a plea deal.  In light of all the circumstances, the decision of the Appellate Division was not contrary to or an unreasonable application of governing federal law.  Petitioner is not entitled to relief on this claim.

C.   Fifth Amendment Right to Remain Silent

During the investigation, Petitioner gave an incriminating statement to Detective Edgar Rios.  Before that statement was admitted into evidence, the trial court conducted a hearing to determine whether it was admissible.  At that hearing, Detective Rios testified that Petitioner was brought into custody in the mid-afternoon.  Detective Rios testified that two detectives were present for most of the interrogation.  Detective Rios read Petitioner his Miranda[3] rights from a pre-printed form and asked him if he understood.  Detective Rios testified that Petitioner said "yes."  Detective Rios testified that Petitioner then read the form aloud to the detectives, but that he had trouble with a few words.  Again, according to Detective Rios, Petitioner stated that he understood his rights.  Detective Rios stated that he then read the form to Petitioner line by line, asking him if he understood each right, to which he responded, "yes."  Then Petitioner, Detective Rios, and the second detective each signed the top portion of the form.  Detective Rios testified that they

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

17

followed the same procedure for the second part of the form --
the waiver portion, and that all three persons signed that
portion of the form, also.  (Answer, Ex. R15.)  Detective Rios
testified that Petitioner's statement was taken after he waived
his _Miranda_ rights.  Detective Rios testified that after the
statement was taken, Detective Wood read it back to Petitioner
and asked him to initial the bottom of each page, and to sign the
end, to indicate that the statement was accurate.  Detective Rios
testified that Petitioner never indicated that he wanted the
questioning to cease or that he wanted an attorney.

At the conclusion of this hearing, the trial court
determined that the state had established beyond a reasonable
doubt that Petitioner had been given his _Miranda_ rights prior to
his custodial interrogation, and that he voluntarily and
intelligently waived his rights, and that the confession was made
voluntarily and intelligently.  (Answer, Ex. R15.)

Petitioner contends that the trial court should not have
permitted his in-custody statement to police to be admitted in
evidence against him, because the statement was not voluntarily
obtained and was obtained in violation of the requirements of
_Miranda v. Arizona_, 384 U.S. 436 (1966).  Specifically,
Petitioner contends that it should have been apparent from the
difficulty he had reading the _Miranda_ form that he did not

18

understand it.  He contends that he did not understand that he was waiving his right to remain silent.

The Appellate Division found that there was sufficient credible evidence from which the trial court could have found that Petitioner's statement was voluntary beyond a reasonable doubt.  Accordingly, it denied relief.

Pursuant to the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment, a confession must be voluntary to be admitted into evidence.  See Dickerson v. United States, 530 U.S. 428, 433 (2000).

> To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.  Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

19

Miranda v. Arizona, 384 U.S. 436, 478-79 (1966).  The Miranda warnings are a constitutional requirement.  Dickerson, 530 U.S. at 444.  "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.  But ... '[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'"  Dickerson, 530 U.S. at 444.

"[T]he ultimate issue of 'voluntariness' is a legal question requiring independent federal determination," and is thus not subject to the § 2254(d) presumption of correctness.  Miller v. Fenton, 474 U.S. 104, 109-110 (1985).

> The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." Arizona v. Fulminante, 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In determining whether a statement is voluntary, Supreme Court precedent requires consideration of "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." Dickerson v. United States, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). These surrounding circumstances include "not only the crucial element of police coercion, Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)," but may also include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." Withrow v. Williams, 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (some internal citations omitted).

Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002).  "[S]ubsidiary
questions, such as the length and circumstances of the
interrogation, the defendant's prior experience with the legal
process, and familiarity with the Miranda warnings, often require
the resolution of conflicting testimony of police and defendant.
The law is therefore clear that state-court findings on such
matters are conclusive on the habeas court if fairly supported in
the record and if the other circumstances enumerated in § 2254(d)
are inapplicable."  Dickerson, 474 U.S. at 117.

     Here, Petitioner does not dispute any of Detective Rios's
testimony; he argues only that the difficulty in his reading the
Miranda form should have alerted the police to the fact that he
did not understand that he was waiving his right to remain
silent.  Petitioner alleges only illiteracy.  He does not allege
any mental or intellectual defect that prevented him from
understanding his rights as the police read them to him.  He does
not allege that he ever stated that he did not understand or that
he evinced a lack of understanding by any means other than his
illiteracy.  He does not allege any other indication that he was
not able to make a voluntary and knowing waiver of his right to
remain silent.  Accordingly, this Court finds that Petitioner's
confession was voluntary and was properly admitted.  Cf. U.S. v.
Gaines, 295 F.3d 293, 299 (2d Cir. 2002) ("an inability to read
or write does not, by itself, establish that the suspect is

21

incapable of making a voluntary and intelligent decision").

Petitioner is not entitled to relief on this claim.

D.   Jury Instructions

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.   In  addition,  in  reviewing  an  ambiguous instruction  ...,  we  inquire  "whether  there  is  a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition  that  we  "have  defined  the  category  of infractions  that  violate  'fundamental  fairness'  very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted). Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law."  Smith v. Horn, 120 F.3d 400, 416 (1997).  See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury

22

instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Where such a constitutional error has occurred, it is subject to "harmless error" analysis. Smith v. Horn, 120 F.3d at 416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999). "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." Id. at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)). In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

Middleton v. McNeil, 124 S.Ct. 1830, 1832 (2004) (internal quotations and citations omitted).

Petitioner contends that the trial court committed numerous errors during its jury instructions, which individually or collectively deprived Petitioner of a fair trial.

### 1.   Lack of Hampton/Kociolek Charges

At trial, both Petitioner's custodial statement to police and numerous out-of-court statements made to other witnesses were admitted against him.

23

Petitioner contends that the trial court should have given a Hampton[4] charge regarding the credibility of a defendant's statement to police and a Kociolek[5] charge regarding other out-of-court admissions and statements attributed to a criminal defendant.

The Appellate Division found the omissions to be harmless error. The court found that there was substantial evidence, other than Petitioner's own out-of-court statements to police and others, from which the jury could conclude that Petitioner formed the intent to commit robbery prior to the lethal act of hitting Piontek, the only intent necessary to sustain a conviction for felony murder. That evidence included testimony that Petitioner had little money on him and had asked another patron to buy him a drink, Gafgen's testimony that Petitioner had drawn Gafgen's attention to Piontek's wad of bills, Gafgen's further testimony that Petitioner rifled Piontek's pants pockets and removed twelve dollars from one of the pockets, and the responding police

---

[4] In State v. Hampton, 61 N.J. 250 (1972), the Supreme Court of New Jersey held that, when a defendant's statement to police in a custodial setting is admitting, the jury shall not be informed of the court's finding that the statement is admissible but shall be instructed to disregard the statement if it finds that it is not credible.

[5] In State v. Kociolek, 23 N.J. 400 (1957), the Supreme Court of New Jersey held that, when a defendant's oral statements have been introduced against him, the trial court must instruct the jury that it should consider such evidence with caution "in view of the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer."

officer's testimony that one of the pants pockets was reversed. Moreover, the Appellate Division found that defense counsel vigorously questioned various witnesses in an attempt to attack the credibility of Petitioner's out-of-court statements, and defense counsel attacked their credibility in his closing. Finally, the Appellate Division found that the trial court did provide the jury the standard instruction regarding the manner in which it should evaluate the credibility of witnesses.

These claimed errors did nothing to shift the burden of proof. Nor, in light of all the circumstances, can it be said that any failure to provide the <u>Hampton</u> and <u>Kociolek</u> instructions had a 'substantial and injurious effect or influence' on the verdict. Petitioner is not entitled to relief on this claim.

    2.   <u>Lack of Cautionary Instruction on Accomplice Testimony</u>

During the trial, the jury learned that Gafgen had been charged with felony murder and robbery and pled guilty to the less serious offenses of hindering apprehension and receiving stolen property. The jury also learned that his maximum penal exposure was five and one-half years in prison. The trial judge instructed the jury that it was "responsible for evaluating the credibility or believability of witnesses," and that as part of that task it "may take into account the interest or lack of interest any witness has in the outcome of this trial."

Defendant did not object to this instruction. During the charge conference, defendant did request a charge on accomplice liability which specified the accomplice could have the same liability as the principal. He argued that this charge would highlight Gafgen's exposure if he had not entered his plea bargain and testified for the State at defendant's trial. The trial judge rejected this charge because she believed

25

that it would confuse the jury.  She feared that the jury might perceive that it could convict defendant as an accomplice rather than as a principal.  She also observed that the jury had heard testimony regarding the considerable reduction in penalty obtained by Gafgen.

(Answer, Ex. R4.)

Petitioner contends that the trial court should have given a cautionary instruction regarding the credibility of Kurt Gafgen, an alleged accomplice.

The Appellate Division found that under state law Petitioner was entitled to a special instruction which drew the jury's attention to the risk of false testimony from a person in Gafgen's position.  "However, omission of this charge was harmless error because the jury heard substantial testimony of the advantageous plea bargain obtained by Gafgen and was instructed that all witnesses' testimony had to be scrutinized in light of the self-interest or bias of the witness."  (Answer, Ex. R4.)

This Court agrees that the failure to charge the jury on accomplice testimony was harmless.  The jury was made aware of the substantial benefits that derived to Gafgen from his plea bargain and testimony and received an instruction to scrutinize all testimony in light of self-interest.  Petitioner is not entitled to relief on this claim.

### 3.   Lack of Ultimate Outcome Charge

Petitioner contends that the trial court should have given the jury an instruction explaining the mandatory thirty-year term he would receive if convicted of felony murder.

The Appellate Division rejected this claim.   "New Jersey adheres to the long-standing distinction in non-capital cases that '[t]he jurors decide the facts in accordance with the law as instructed by the court, and the court determines the punishment to be imposed upon the jury finding of guilt.'   ...   The rationale is that sentencing information fails to help the jury in deciding the issue of guilt, distracts the jury by confusing the issue to be decided, and invites a compromise verdict."   (Answer, Ex. R4 (citations omitted).)

There is no constitutional requirement that a jury be given an "ultimate outcome" instruction.  To the contrary, the Supreme Court has held that it is "well-established that when the jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"   Shannon v. United States, 512 U.S. 573, 579 (1994) (footnote omitted) (quoting Rogers v. United States, 422 U.S. 35, 40 (1975)).  Thus, Petitioner is not entitled to relief on this claim.

### 4.   Lack of Charge on Lesser-Included Offense

Petitioner contends that the trial court should have given the jury an instruction on the lesser-included offense of aggravated

assault, under N.J.S.A. 2C:12-1b(1).  Petitioner contends that he has the right to have the jury consider all lesser-included offenses shown by the evidence.

The Appellate Division rejected this claim on state-law grounds.  According to the Appellate Division, under New Jersey law, as long as there is a rational basis in the evidence, a defendant who requests a jury charge on a lesser-included offense is entitled to it.  Here, however, the Appellate Division found that to find Petitioner guilty of aggravated assault, the jury would have had to find a higher degree of intent than it would have to find defendant guilty of the "strict liability" offense of felony murder.  "[A] conviction for aggravated assault could thus have required the jury to find more rather than 'the same or less' facts, thereby failing to satisfy the statutory condition applicable here for charging a lesser included offense." (Answer, Ex. R4.)

This Court is bound by the state courts' conclusions as to state law.  Cf. Kontakis v. Beeyer, 19 F.3d 110, 119 (3d Cir.), cert. denied, 513 U.S. 881 (1994) (habeas relief not to be granted when state court has determined that charge on lesser-included offense is not supported in the evidence); Fleener v. Duckworth, 559 F.Supp. 1322, 1326 (? 1983) (federal court bound by state law, which held that there were no lesser-included offenses of felony murder; hence, petitioner's desire to have other homicide, assault

and theft offenses charged to the jurors rejected).  As the refusal
to charge the jury on aggravated assault conformed to state law,
Petitioner was not thereby deprived of due process.  Petitioner is
not entitled to relief on this claim.

F.   Prosecutorial Misconduct

The U.S. Supreme Court has recognized the obligation of a
prosecutor to conduct a criminal prosecution with propriety and
fairness.

> He may prosecute with earnestness and vigor -- indeed, he
> should do so.  But, while he may strike hard blows, he is
> not at liberty to strike foul ones.  It is as much his
> duty to refrain from improper methods calculated to
> produce a wrongful conviction as it is to use every
> legitimate means to bring about a just one.  ...
> Consequently, improper suggestions, insinuations, and,
> especially, assertions of personal knowledge are apt to
> carry much weight against the accused when they should
> properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).  "The line
separating acceptable from improper advocacy is not easily drawn;
there is often a gray zone.  Prosecutors sometime breach their duty
to refrain from overzealous conduct by commenting on the
defendant's guilt and offering unsolicited personal views on the
evidence."  United States v. Young, 470 U.S. 1, 7 (1985).

> The prosecutor's vouching for the credibility of
> witnesses and expressing his personal opinion concerning
> the guilt of the accused pose two dangers: such comments
> can convey the impression that evidence not presented to
> the jury, but known to the prosecutor, supports the
> charges against the defendant and can thus jeopardize the
> defendant's right to be tried solely on the basis of the
> evidence presented to the jury; and the prosecutor's
> opinion carries with it the imprimatur of the Government

29

and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

Id. at 18.

Under U.S. Supreme Court precedent, where a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by or responsive to prior comments by opposing counsel. Darden, 477 U.S. at 181-82. Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

At the beginning of the trial, the trial court reminded the jury that "what counsel says in opening statements is not evidence. Evidence comes to you from the witness stand." (Answer, Ex. R16.) The prosecutor then began his opening statement.

> Mr. Hamilton, ladies and gentlemen of the jury, the sound, that sound you didn't hear, and I didn't hear. That sound Anna Piontek didn't hear. Gerald Piontek didn't hear. Anne Maria Piontek Martini didn't hear. That sound was heard by two people. It was heard by the

> defendant in this case, David Breece, and it was heard by
> Kurt Gafgen.  And if it weren't heard by Kurt Gafgen, we
> wouldn't be here.  Where is Sonny?

(Answer, Ex. R16.)  At that point, defense counsel objected, and

the trial judge advised the prosecutor that if he kept going in

this direction, the opening might cross over the line as to whether

it was too emotional.  The prosecutor changed direction.  (Answer,

Ex. R16.)

Later, the prosecutor remarked on certain legal principles.

> I want to touch just briefly on some of your, some
> of the principles that are going to guide you as you
> listen to the testimony as it's going to be presented to
> you from the witness stand.  First of all, what I say to
> you in my opening remarks is not evidence.  The evidence
> is going to come from the witnesses on that witness stand
> and any physical evidence that is presented to you such
> as photographs, the statement or confession from the
> defendant, charts, drawings.  That is the evidence upon
> which you must return your true and just verdicts.

> The principles that guide you in that regard are,
> first of all, the presumption of innocence.  The
> defendant sits before you cloaked in that presumption of
> innocence, but that cloak will not hide from you the
> truth.

> The burden of proof, the state has the burden of
> proof, ... .  That burden rests with the state throughout
> the case and is never lifted ... .

(Answer, Ex. R16 at 15-16.)  At the conclusion of the trial, the

judge also instructed the jurors that they had to accept the law as

stated by him, that they were to weigh the evidence without

passion, prejudice or sympathy, that "evidence" was comprised of

what was heard from the witness stand and the documents and

exhibits marked into evidence, and that defendant had no obligation

to prove his innocence and was presumed to be innocent until "each and every" element was proved beyond a reasonable doubt by the State, whose burden was never shifting.   (Answer, R19 at 56-60.)

Petitioner contends that the remarks of the prosecutor unfairly appealed to the emotions of the jury and deprived him of the presumption of innocence.

The Appellate Division acknowledge the prosecutor's "dramatic prologue," but held that its prompt interruption and general jury instructions to reject pleas to sympathy and to decide the case on the evidence rather than oratory by counsel "were sufficient to blunt any undue sympathy invoked by the prosecutor."   (Answer, Ex. 4.)

The Appellate Division also rejected the argument that the prosecutor denigrated Petitioner's constitutional right to remain silent and tried to shift the State's burden of proof when he referred to defendant as hiding behind the cloak of the presumption of innocence.  "Read in context with his entire opening remarks, we conclude that the jury probably interpreted these remarks as his intention to strip the defendant of the presumption of innocence by the State's presentation of overwhelming evidence of his guilt." (Answer, Ex. 4.)

The conclusion of the Appellate Division is not contrary to nor an unreasonable application of federal law.  The opening appeal to emotion was curtailed and the jury was properly instructed to

decide the case on the evidence. In addition, the passing reference that the cloak of the presumption of innocence would not hide the truth from the jury did not render the trial unfair. The prosecutor never suggested any shifting of the burden of proof, and the jury was properly instructed. Accordingly, Petitioner is not entitled to relief on this claim. Cf. Sistrunk v. Dragovich, 96 Fed.Appx. 796 (3d Cir. 2004) (statement that presumption of innocence "is not a shield behind which the guilty can hide" did not render trial unfair where it was responsive to statements of defense counsel, was a fair statement regarding the evidence the prosecutor presented to try to overcome the presumption, and was mitigated by trial court's subsequent instructions regarding the presumption).

F.   Ineffective Assistance of Counsel

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel is "the right to effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for

33

counsel's unprofessional errors, the outcome would have been different.  Strickland v. Washington, 466 U.S. 668, 687, 694 (1984).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  Strickland at 694. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id. at 687.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

The performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed."  Id. at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Id. at 690-91.  If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors

34

prejudiced the defendant within the meaning of <u>Strickland</u>.   <u>See</u> <u>Berryman v. Morton</u>, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right. <u>Evitts v. Lucey</u>, 469 U.S. 387 (1985).   The <u>Strickland</u> standard for effective assistance of counsel applies to appellate counsel. <u>See</u> <u>Lewis v. Johnson</u>, 359 F.3d 646, 656 (3d Cir. 2004).   Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, <u>see</u> <u>Jones v. Barnes</u>, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994).

Petitioner contends that his trial counsel provided ineffective assistance by failing to present evidence of his illiteracy at the <u>Miranda</u> hearing, by failing to object to the admission of the autopsy photos, and by failing to object to the jury instructions challenged in this Petition.   He contends that his appellate counsel provided ineffective assistance by raising these claims on direct appeal, instead of in a motion for post-conviction relief, where he would have been entitled to an

35

evidentiary hearing to present evidence outside the record in support of his claims.

The Appellate Division found that defense counsel was not ineffective. Although errors occurred, no prejudice flowed from those errors. (Answer, Ex. R10.)

As this Court has previously found that there was no prejudicial error flowing from any of the alleged deficiencies of trial counsel, Petitioner is not entitled to relief on his claims that trial and appellate counsel failed to provide the effective assistance required by the Sixth Amendment. Moreover, with respect to the claim regarding appellate counsel, Petitioner has failed to explain how he would have expanded the record in the motion for post-conviction relief to establish these claims. Petitioner is not entitled to relief on this claim.

G.   Deprivation of Due Process in PCR Proceeding

Petitioner contends that the trial court deprived him of due process by failing to conduct an evidentiary hearing in his post-conviction relief proceeding.

Errors in state post-conviction relief proceedings are collateral to the conviction and sentence and do not give rise to a claim for federal habeas relief. See, e.g., Ferguson v. State, 1996 WL 1056727 (D.Del. 1996) and cases cited therein. In any event, Petitioner has failed to establish how the deprivation of a

hearing deprived him of any federal constitutional right. Petitioner is not entitled to relief on this claim.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Petitioner has failed to make a substantial showing of the denial of a constitutional right. No certificate of appealability shall issue.

## V.   CONCLUSION

For the reasons set forth above, the Petition must be denied. An appropriate order follows.

Garrett E. Brown, Jr.
Chief Judge
United States District Court

Dated: OCTOBER 28, 2005

37